**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| TAMMY L. GARZA, ) </br> ) </br> Plaintiff, ) </br> ) </br> vs. ) </br> ) </br> NANCY A. BERRYHILL, Acting ) </br> Commissioner of the Social Security ) </br> Administration,[1] ) </br> ) </br> Defendant. ) | Cause No. 2:15-cv-271-WTL-MJD |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tammy L. Garza requests judicial review of the final decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Commissioner"), denying Garza's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). The Court, having reviewed the record and the briefs of the parties, rules as follows.

### I. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill automatically became the Defendant in this case when she succeeded Carolyn Colvin as the Acting Commissioner of Social Security on January 23, 2017.

work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis.[2] At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the Administrative Law Judge's ("ALJ") decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is

---

[2]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

not required to address every piece of evidence or testimony presented," he must "provide an accurate and logical bridge between the evidence and [his] conclusion that a claimant is not disabled." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Id.* (citation omitted).

## II.     BACKGROUND

Garza applied for Disability Insurance Benefits and Supplemental Security Income benefits in November 2006, alleging disability since March 13, 1997. The Agency denied Garza's claims initially on February 15, 2007. On March 27, 2008, following a hearing requested by Garza, ALJ Dale Garwal found that Garza became disabled as of November 3, 2006, but was not disabled prior to that date. As Garza's insured status had expired on December 31, 1997, the ALJ's finding precluded an award of Disability Insurance Benefits, and Garza requested review, which the Appeals Council denied on April 14, 2010. Garza appealed to the United States District Court for the Central District of California, which remanded the case on June 13, 2011, concluding that the ALJ erred in evaluating the medical evidence and erred in applying res judicata since there was no evidence of a prior decision. Following a second hearing and a third supplemental hearing, ALJ William Sampson issued a decision on April 18, 2013, which Garza appealed to the Appeals Council. This time the Council remanded the case, noting that ALJ Sampson had not evaluated the treating physician opinion of Dr. Taban. After a fourth hearing, ALJ Sampson again denied benefits for the period prior to October 2010. As the Appeals Council did not assume jurisdiction, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.984. Garza filed this timely appeal.

## III. THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ determined that Garza had not engaged in substantial gainful activity since the alleged onset date. At steps two and three, the ALJ concluded the claimant suffered from the following severe impairments: effects of multi-level lumbar fusions, with degenerative changes and obesity, with an additional severe impairment after October 1, 2010, of listing level rheumatoid arthritis.

At step four, the ALJ determined that, prior to October 1, 2010, Garza could perform sedentary work with: occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolding; occasionally balancing, stooping, kneeling, crouching, or crawling; frequent handling; avoiding concentrated exposure to extreme temperatures, wetness, humidity, and vibrations; no work at unexposed heights or dangerous moving machinery; occasionally operating foot controls; and the option to alternate between sitting and standing at least once every thirty minutes for at least five minutes at a time. *Id.* The ALJ concluded that prior to October 1, 2010, Garza could not perform her past work but could perform a significant number of other jobs. Accordingly, the ALJ concluded that, prior to October 1, 2010, Garza was not disabled as defined by the Act.

## IV. EVIDENCE OF RECORD

The medical evidence of record is aptly set forth in Garza's brief (Dkt. No. 20) and need not be recited here. Specific facts are set forth in the discussion section below where relevant.

## V. DISCUSSION

In her brief in support of her complaint, Garza advances several objections to the ALJ's decision; each is addressed below.

### A. Weight Given to Treating Physicians

Garza argues that the ALJ failed to properly assess the treating physician opinions of Drs. Nagalberg and Taban. These arguments are addressed, in turn, below.

Under the law as it existed at the time of the ALJ's decision,[3] a treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *see* 20 C.F.R. § 404.1527(c)(2) .

An ALJ must give a treating physician's opinion controlling weight if it is both "(1) supported by medical findings; and (2) consistent with substantial evidence in the record." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2)). If the ALJ finds that the opinion is not entitled to controlling weight, the ALJ must still assess the proper weight to give to the opinion. *See id.* This requires consideration of several factors, including the "length, nature, and extent of the physician and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue." *Id.* (citations omitted).

---

[3]For claims filed on or after March 27, 2017, 20 C.F.R. § 404.1520c applies. Under that provision, no special or evidentiary weight is given to medical opinions or prior administrative medical findings.

5

Garza first argues that the ALJ failed to give adequate weight to the opinion of treating physician Dr. Steven Nagelberg and failed to comply with all provisions of 20 C.F.R. § 404.1527 in evaluating the treating physician's opinion.

With respect to Dr. Nagelberg's opinion, the ALJ found the following:

> For example, after this most recent surgery the claimant was seen by Dr. Nagelberg in January 2004 leaving a gap in care; there was no evidence of emergency room care or symptom exacerbation, but on the follow up the claimant's lumbar flexion was now limited to 40°, her extension to 10°, and she complained of ongoing pain (Exhibit 12F). Conversely, the claimant's motor function remained intact, she continued to be able to heel/toe walk despite decreased reflexes in her lower extremities, and her straight leg raise test (SLR) was ***now negative*** (Id.). At the March exam, the claimant's flexion had increased by 20° to 60°, her extension remained the same at 10° (Id.). The claimant continued to have reduced lower extension reflexes but her sensations remained intact (Id.). At her April 2004 revaluation, the claimant endorsed severe pain but surprisingly she had near full flexion (Id.). The physician was able to appreciate tenderness over the paraspinal muscles, but he found no neurologic deficits in the lower extremities (Id.). Again, without much clinical evidence, and based apparently on the claimant's subjective reports, the physician opined throughout the foregoing period that the claimant was "temporarily totally disabled" (Exhibit 5F, 12F). Doctors Nagelberg and Gitter saw the claimant during this period establishing a treating relationship with claimant, but there was little clinical evidence to support the foregoing opinions. To the contrary, the claimant's range of movement increased, she was not neurologically deficient, and her straight leg raise test (SLR) was afforded little deference. This was well supported as the limitations noted by the examining physicians did not match the actual claimant's functionality (Id.). In fact, the only abnormality noted, the claimant's subjective allegations of severe pain as her range of movement was generally within normal limits (Id). Furthermore, as noted throughout this decision, these workers' compensation physician opinions touched on issues clearly reserved for the Commissioner, and appeared to have been based on State law, not the laws and regulations that govern this Agency.
>
> In June of that same year, during another follow up with Nagelberg, the claimant reported low back pain with radiation into the legs; the accompanying exam notes remained consistent through February 2005 (Id.). During these exams, the claimant continued to subjectively report ongoing severe pain, claiming that at times she was essentially bedridden due to pain (Id.). While she was found tender

6

in the paraspinal region bilaterally on exam with decreased spinal ranges of movement, she remained neurologically intact (Id.). There were no objective references to sensory deficits, the claimant's reflexes were now intact and symmetrical, and her straight leg raise test (SLR) remained negative at 90º suggesting that despite the foregoing fusion, she had no residual range of movement limitations (Id.). The claimant was also able to stand and heel/toe walk without difficulty (Id.). The only continuing course of treatment at this was medication based (Exhibit 12F).

The claimant did undergo an injection in December after reporting radicular symptomology, and her workers' compensation physician again opined that she remained 100% disabled under the "California Worker's Compensation Laws" (Id.). Yet, as noted above, it is clear that the physician was not basing these opinions in Social Security Law, and as explained throughout this decision and incorporated by reference herein, little weight was afforded to this statement as the determination of disability is for the Commissioner. Interestingly, at the time of this assessment, the same physician noted that the claimant was at maximum medical improvement, but that she needed a referral for a detoxification program due to her prolonged use of narcotic pain medications (Id.). Other issues included the claimant's noncompliance with her ordered weight loss program and a subsequent "no show" in March 2005 (Id.). As previously stated, there is likely a financial aspect to this lack of follow up, but throughout the period of adjudication, including the period after the established onset date, it is clear that the claimant was not complaint with her physicians' orders for weight loss, noting specific references in Exhibit 51F where the treating clinician documented the implications of the claimant's weight and ongoing smoking.

Dkt. No. 1-1 at 22-23.

Specifically, Garza points to Dr. Nagelberg's conclusion that Garza had reached permanent and stationary status and his opinion that she was limited to part-time sedentary work, no more than four hours per day. Nagelberg further opined that if her mental limitations were factored in she would be unable to engage even in part-time work because of her difficulties with concentration and attention. Garza argues that the ALJ did not acknowledge or assess this treating specialist's opinion limiting Garza to part-time sedentary work.

Garza is correct that the ALJ did not address this one particular finding by Dr. Nagelberg. However, the ALJ's detailed analysis of Dr. Nagelberg's findings thoroughly explains his reasons for discounting Dr. Nagelberg's opinions and is supported by substantial evidence in the record. "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004)). Accordingly, the Court finds that the ALJ did not err with regard to Dr. Nagelberg's opinion.

Next, Garza also argues that the ALJ did not set forth a rationale for assigning more weight to the opinion of a non-examining source than the opinion of an examining specialist, Dr. Taban.

With respect to Dr. Taban's opinion, the ALJ found the following:

> Nevertheless, in early 2007, the claimant reported increasing back pain, but interestingly she remained capable of flexing to 70° with her extension being to 15°, due to increased complaints of pain, there were medication increases and she was scheduled for another MRI the results of which revealed moderate L3-L4 vertebral level spinal stenosis secondary to mild degenerative changes (Exhibits 22F, 23F, and 39F). Following a number of sessions for unsubstantiated knee allegations (Exhibit 22F and 23F), the claimant was told she needed to lose weight and attend physical therapy, subsequently, she started another round of epidural steroid injections (ESI) that continued through January 2008 (Exhibit 23F). At this exam, the claimant's psychological status was normal, and her only noted abnormality, paravertebral tenderness (Id.).
>
> Concurrently, the claimant was evaluated for ongoing low back pain that she reported radiated into the left buttock, interestingly, she denied further radiation, which as discussed above was not consistent with her claims of pain radiation into the feet (Exhibit 13F). On exam, the attending physician, Dr. Taban, noted no neurological dysfunction, the claimant's cervical range of movement was full, and her Spurling's was negative (Id.). The claimant had no appreciable upper extremity

8

weakens, her deep tendon reflexes were trace, but there were no sensory deficits (Id.). The claimant's gait was found somewhat antalgic, but she remained capable of heel/toe walking with normal flexion range of movement (Id.). There were no gross motor deficits, but the claimant's straight leg raise test (SLR) was positive at 45º, based upon these findings, the physician felt it necessary for further diagnostics, suggesting that she undergo electromyography testing and obtain an x-ray to determine if there was any appreciable instability to her hardware (Id.).

Shortly after this one-time exam, Dr. Taban completed a solicited medical source statement (Exhibit 24F). In this assessment, Dr. Taban included diagnoses that included radiculopathy failed back syndrome, obesity hypertension (HTN), and bilateral carpal tunnel syndrome (CTS) (Id.). The one-time examining physician also opined that the claimant had been incapable of working since the first surgery, and that she had never experienced pain improvement (Id.). There was mention of transcutaneous electrical nerve stimulation unit, and he further limited the claimant opining that she had limitations to almost all postural activities (Id.). The claimant was found capable of sitting less than 30 minutes at a time, but incapable of sitting for more than 2 hours in an 8-hour period (Id.). Lastly, the physician found the claimant in need of constant breaks, i.e. as many as needed, with limitations to her overhead lifting, reaching, and pushing/pulling (Id.).

Despite these limitations and the contentions of the representative, the undersigned found this opinion worthy of little weight. First, it was based on a one-time exam; moreover, this physician in the actual records indicated that further testing was necessary to determine if the claimant was in fact experiencing any hardware complications, which she did not undergo prior to the opinion. There was also ample evidence as noted above that the claimant at times did in fact experience symptom relief; in fact, she worked at times during which this physician opined she would be incapable, which was addressed above in Finding 2 and throughout this portion of the sequential evaluation. Also, the physician found no clear evidence of canal or neuroforaminal compromise at any level, noting that the claimant was neurologically unremarkable documenting that her claims of low back pain were "unexplained" (see generally Exhibit 13F). This is important, as SSR 96-4p, precludes the undersigned from relying on this assessment as it appeared to be based in large part on the uncritical acceptance of the claimant's subjectively reported symptoms. Moreover, while some imagery abnormalities were noted at the L3-L4 vertebral level, Dr. Taban opined that these were a "more recent condition," making his assessment inapplicable back to the alleged onset date. Lastly, this physician never examined the claimant prior to September 2007, approximately 10 years after the alleged onset date; this significant gap left the undersigned questioning whether this physician could have knowledge of the claimant's functionality at all times relevant, as there is no

indication that he/she had reviewed the claimant's entire longitudinal record, as the medical experts had. For these reasons, the undersigned rejected the representative's argument that this assessment should be afforded controlling weight.

Dkt. No. 1-1 at 25-26.

Again, the ALJ's detailed analysis of Dr. Taban's findings thoroughly explains his reasons for discounting Dr. Taban's opinions and is supported by substantial evidence in the record. Accordingly, the Court finds that the ALJ did not err with regard to Dr. Taban's opinion.

### B. Opinion of Medical Expert

Garza also argues that the ALJ erred in rejecting the portion of specialist Dr. Lorber's opinion that Garza satisfied Listing 1.04. With regard to Dr. Lorber's opinion, the ALJ found the following:

> Despite the claimant's diagnosed impairments, the medical evidence did not document Listing level severity. At the first hearing, Dr. Lorber opined that between the alleged onset date and March 31, 2001, the claimant's back disorder met Listing 1.04(A). (Hearing testimony). However, at the second hearing, Dr. Hutson opined that the claimant's condition(s), either singly or in combination, did not meet or medically equal the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 prior to the established onset date as the record lacked evidence of the requisite neurological deficits needed to establish such a meeting (Hearing Testimony citing exhibits 6F and 32 F, in which the examining physician noted any neurological limitations). Dr. Hutson based the aforementioned opinion on a thorough review of the claimant's *complete* record as it existed at the time of the review as well as the testimony elicited at the hearing. As such, the undersigned finds that Dr. Hutson had particular and detailed knowledge of the facts in this case as well as the standards set forth in the disability laws and Regulations; moreover, since that hearing, there has been no new *and* material evidence to contradict Dr. Hutson's opinion submitted regarding the foregoing period (see generally Exhibits 48F-57F). As such, the undersigned concludes that this independent medical opinion remains appropriate. Based upon this information, the undersigned afforded great weight to Dr. Hutson's opinion. Accordingly, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 prior to the established onset date.
>
> The undersigned does recognize that the claimant's attorney argued that she met Listing 1.04(A), yet at the foregoing hearing when given the opportunity

to cross-examine Dr. Hutson, the attorney did not pursue this particular issue (i.e. the lack of all neurological deficits). Thus, the undersigned finds no reason not to afford great weight to this orthopedic surgeon's testimony.

Dkt. No. 1-1 at 15-16. Further,

> As for the opinion evidence not already discussed, two independent and board certified medical experts, doctors Arthur Lorber and Richard A Hutson, provided opinions concerning the claimant's severe impairments and functionality. At the first hearing, Dr. Lorber noted a number of inconsistencies regarding the claimant's compliance with her treatment regimens (as noted above), and after listening to the claimant's testimony opined that the claimant's condition met listing 1.04(A) from the alleged onset date through March 31, 2001, the year following the most recent surgical intervention (Hearing Testimony). However, the undersigned afforded this assessment very little weight for one major reason, at the second hearing, and based on a more complete record, Dr. Hutson noted (which is extensively discussed above in the medical history review), that the claimant lacked the neurological deficits needed for a meeting of a listing (Hearing Testimony). The undersigned found Dr. Hutson's testimony well supported by the exhibits noted previously, which documented the absence of neurological deficiencies.
>
> Following this period (i.e. after the final surgery), both medical experts opined that the claimant's objective medical records were consistent with a sedentary residual functional capacity (Hearing Testimony). These assessments were very consistent, and the assessed residual functional capacity noted above, incorporated limitations consistent with both experts' opinions. However, at the first hearing, Dr. Lorber also noted that as of the claimant's referral in October 2010 to the rheumatologist, that the claimant medically equaled listing 14.09 (Hearing Testimony). This is addressed below and was afforded significant weight, which is consistent with the later onset portion of this decision. Therefore, the undersigned afforded lesser weight to Dr. Hutson's opinion concerning this later period.
>
> At the first hearing, the claimant's attorney contended that Dr. Lorber's testimony that he had over 7 pages of notes that he derived from his review of the record. Moreover, the undersigned repeatedly questioned Dr. Hutson who affirmed was based on an incomplete record, which should have made it less persuasive. While the undersigned does recognize that Dr. Lorber only reviewed through Exhibit 29F, the additional objective magnetic resonance imaging (MRI) test results were read into the record, and he was present for the claimant's testimony, which the attorney had ample opportunity to develop as she saw fit. At the later hearing, in closing, the claimant's attorney then contended that the testimony of Dr. Hutson should be disqualified as he only considered "7 pages of

11

records" and that his review considered only the evidence prior to 2006. However, this is an incorrect assertion. Dr. Hutson noted on a number of occasions that he had in fact considered the complete record as it existed at the time of the hearing, including the very recently submitted records from the attorney (see generally Exhibits 1F-47F). Thus, the undersigned found little merit in the attorney's arguments at that prior time; more specifically, that the medical experts' testimony should have been ignored when assessing the claimant's residual functional capacity. In sum, although the claimant's impairments were severe, they did not preclude her from completing basic work related activities prior to October 1, 2010. The assessed residual functional capacity is supported by the objective findings and the other factors discussed above.

Dkt. No. 1-1 at 28-29. Both Dr. Lorber and Dr. Hutson were impartial medical experts. Dr. Lorber provided testimony at the June 7, 2012, hearing, and Dr. Hutson provided testimony at the second hearing on March 4, 2013. Contrary to Garza's assertion, the ALJ set forth his rationale for the weight given to both Lorber's and Hutson's testimony. Accordingly, he did not commit error.

### C.     Credibility Determination

Garza also argues that the ALJ committed factual and legal errors when explaining why he discredited her testimony regarding her subjective symptoms. As the ALJ correctly acknowledged under the standard that applied at the time,[4] with regard to subjective symptoms such as pain, if a claimant has a medically determinable impairment that is reasonably expected to produce pain, then the ALJ must evaluate the credibility of the claimant's testimony regarding the extent of that pain. "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, treatment, and limitations," *see* 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, and justify

---

[4]S.S.R. 96-7p has been superseded by S.S.R. 16-3p, which the Agency explained "eliminate[d] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term" and "clarif[ied] that subjective symptom evaluation is not an examination of an individual's character."

12

the finding with specific reasons. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The regulations further provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). Additionally, because the ALJ evaluates credibility by questioning and observing a live witness, not simply a cold record, an ALJ's credibility determination is reviewed deferentially and should be overturned only if it is "patently wrong." *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, "[t]he determination of credibility must contain specific reasons for the credibility finding" and "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* (citing *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)).

Garza objects to several specific reasons that the ALJ gave for finding that she was not credible. First, she alleges that the ALJ improperly considered her failure to quit smoking in assessing her credibility. As the Seventh Circuit has found, given how difficult it is for many people to quit smoking, smoking "is an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).

Next, she objects to the ALJ's basing his credibility determination in part on her failure to seek additional medical treatment. An ALJ must not draw an adverse inference about treatment without properly assessing the underlying reasons. *See, e.g.*, *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Here, the ALJ did recognize the fact that there was "likely a financial aspect to the claimant's limited follow up," Dkt. No. 1-1 at 21, but nonetheless appeared to have considered her failure to seek treatment as a factor in his credibility determination.

13

Garza also alleges that the ALJ erred when considering evidence that she attempted to return to work part time. The ALJ found the following:

> Regardless of this finding, the undersigned notes that this work activity weighed heavily on the persuasiveness of the claimant's allegations regarding the severity and limiting nature of her impairments during the period prior to the established onset date, as this work was evidence that during periods relevant to the issue of total disability, the claimant's activities of daily living were not as limited as alleged. The irreconcilable nature of her claims and work activity eroded the credibility of her allegations.

Dkt. No. 1-1 at 10. Garza is correct that failed efforts to work support rather than detract from credibility. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010).

Likewise, the ALJ's consideration of Garza's activity of being the primary caregiver for her elderly father and dependent sister is not supported by the record as cited by the ALJ. While the progress note indicates that "She is taking care of her Dad and Sister" (Dkt. No. 1359), the ALJ uses this statement to find that Garza was the "primary caregiver." Nor does the ALJ explain or explore what "taking care of" entailed.

What remains of the ALJ's credibility determination is as follows:

> The claimant asserts that she was unable to perform any work prior to the established onset date primarily because of the late effects of her back injury/surgeries and her obese body habitus (Exhibits 3E and 8E). The claimant alleged that she could not sit, stand, or walk for prolonged periods due to "intractable" pain (Id.). Furthermore, the claimant alleged that her range of movement was very limited after her fusions and that she had trouble sleeping and with the completion of normal activities of daily living, all due to pain (Id.). At each consecutive hearing, the claimant further contended that there were times when she "could not move" and that she was essentially bedridden (Hearing Testimony). The claimant testified that there were times where she had to be carried into her physician's visits, noting further that she "could not stand at all" (Id.). Throughout the period of adjudication, the claimant continually reiterated all of her previous limitations, further noting at times that she lacked feeling in either lower extremity, and that her pain was never controlled, reporting radiating pain from her low back down to her feet, bilaterally (Id.). In addition to the foregoing, the undersigned recognizes that an individual's symptoms may suggest a greater level of impairment severity than what is shown by the longitudinal medical record that is discussed below. As such, the

undersigned has also considered other evidence in assessing the credibility of the claimant's statements regarding their limitations and restrictions. 20 CFR 404.1529(c) and 416.929(c) provide guidance on the kinds of evidence that may be considered when additional information is needed to assess the claimant's credibility. These may include, and are not limited to the claimant's daily activities, their pain or other symptoms, aggravating factors, their treatment regimen including medications, any measures other than treatment they use to help alleviate their symptoms, and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms (See generally SSR 96-7p).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to October 1, 2010, for the reasons explained in this decision.

The claimant's allegations of symptoms consistent with her severe impairments, including the limitations noted immediately above, were not accepted as alleged because those allegations were not consistent with the available objective medical evidence prior to the established onset date. The undersigned recognizes that the record is lengthy noting further that additional records were recently submitted, as was additional testimonial evidence from the claimant's daughter.

However, even after reviewing the objective and subjective reports, the undersigned found the claimant's allegations during the foregoing period less than persuasive. In support, the undersigned does recognize that in October 1997 the claimant was involved in pain management after reporting that she was injured at work, shortly after having a child, testifying that she went back to work too soon (Exhibits 1F, 5F, Hearing Testimony).

At the time of these early exams, the claimant endorsed ongoing low back pain and radicular symptoms; on exam, the attending physician noted that the claimant was in noticeable distress and tender along the L4-S1 vertebral levels with spasms and pain to palpation (Id.). The claimant's straight leg raise test (SLR) was positive at 20°, however, the physician noted no sensory deficits, and the claimant's strength remained within normal limits in both lower extremities (Id.). At the most recent hearing, the representative contended that these early records established that the claimant was so severely incapacitated by pain that she would have been incapable of sustained work; however, the objective findings noted here did not fully support the claimant's reported level of dysfunction. Moreover, SSR 96-4p states that no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or

15

mental impairment. As noted here, while there were some abnormalities noted, the claimant's strength, sensations, and ability to ambulate were not limited to the extent alleged (see generally Exhibits IF-5F).

The claimant was referred for imagery; a magnetic resonance imaging (MRI) test revealed L4-L5 vertebral level disc issues with narrowing and impingement of the L5 left nerve root (Id.). As a result, the physician recommended that the claimant undergo a discogram due to her reported unresponsiveness to her previous conservative treatment regimens (see generally Exhibits IF, I5F). The discogram was completed and the results were negative at L3-L4 vertebral level, but positive at the L4-L5 vertebral level with noted pain and a disc tear, but as testified to by Dr. Huston, there were *no noted neurological deficits* (Exhibit I5F, 33F).

Subsequently, a follow up magnetic resonance imaging (MRI) test confirmed no L5-SI vertebral level abnormalities but that there remained a herniated disc at the L4-L5 vertebral level with moderate left lateral stenosis and mild spinal canal stenosis (Exhibit 4F). However, there was no right lateral recess or neural foramina issues, consistent with degenerative disc disease (Id.). This was problematic, as the undersigned found it difficult to reconcile the claimant's subjective allegations of severe ongoing pain with the minimal objective findings outlined here, which was a factor used when assessing the weight afforded to her subjective claims of pain as well as the limiting nature of her impairment, at that time. Most recently, the representative indicated that the post-discogram period was plagued by severe ongoing pain.

The record was clear that in early 1998 that the claimant underwent a L4-L5 vertebral level posterolateral fusion, hemi-laminotomy, and discectomy (Exhibit 16F). Yet, follow up records indicated that the claimant's therapeutic regimen had improved her condition, as the June 1998 records documented reports to the treating physician indicating that the claimant's condition had improved, despite continued reports of lumber pain (Exhibit 33F). In response, the claimant was ordered to follow her home exercise program (HEP) (Id.). Unfortunately, the following month, the clinical notes documented increased muscle spasms and pain that the claimant attributed to the ongoing therapy (Id.). Interestingly, these same records included endorsements by the claimant that the therapy was "helping to a degree" (Id.). Objectively, the claimant remained tender to palpation, with appreciable muscle tightness to the left (less so on the right); however, she denied leg pain (Id.). This was problematic as the claimant testified on numerous occasions that her pain radiated into her legs, but even in comparing these complaints with earlier records, it was clear that the claimant's pain was limited to her low back region, radiating no further than the buttock (see generally Exhibits 13F, 33F).

Secondary to the reported benefit, the claimant's treating physician at that time opined that the claimant needed a more structured therapeutic regimen at a

facility (Exhibit 33F/10). However, at her August 1998 follow up the claimant continued to report increasing pain, which prompted an injection and instructions to continue therapy (Id.). The claimant did indicate that at one point, her pain was so severe that she was going to go to the emergency room, but there were no supportive records to corroborate this (Id.). Moreover, throughout this period, while complaining of severe ongoing pain, the claimant never reported incontinence issues or other symptoms that warranted emergency care/treatment (Id.). In September, the claimant reported, after her previous reports of improvement, that she was no longer getting relief from her physical therapy regimen; perplexingly, at this same exam, the only objectively noted abnormality included tenderness to palpation along the lumbar spine (Id.). Despite this unremarkable clinical evidence, the worker's compensation physician continued to excuse her from working as an apartment manager (Id.). This assessment is not refuted, and is consistent with Finding 6, noted below.

Immediately thereafter in October 1998, the claimant consulted with Dr. Henry for electromyography testing due to radicular-type symptoms (Exhibit 44F). At this time, the claimant endorsed bilateral leg numbness, and upon exam, the physician did note decreased sensations at a number of vertebral levels, which equated to a diagnosis of mild left radiculopathy without evidence of denervation (Id.). The physician also found the claimant's symptoms consistent with mild bilateral LS radiculopathy without denervation based upon the absence of peroneal and/or tibial neuropathy (Id.). At her December 1998 follow up, the claimant's physician considered her previous operative intervention unsuccessful/failed and she was therefore scheduled for follow up surgery that was to include hardware removal and a new fusion (Exhibits 2F and 6F). Upon discharge following the foregoing surgery, the claimant was found to be doing well; in fact, she was ambulatory at discharged shortly after the surgery with instructions to control her diet to assist in weight loss (Id.). The claimant continued to follow a narcotic based medication regimen, with orders to increase her physical activity (Id.). This physician recommendation was difficult to reconcile with the claimant's allegations as this is not a course of treatment one would expect if the claimant's treating physician felt her condition was so severe as to leave her almost bedridden as testified to the hearings (see generally Exhibit 2F, 36F, Hearing Testimony). Moreover, during the operation, it was noted by the surgeon that the claimant's hardware was loose, but thereafter, the claimant tolerated her medical care well (Exhibit 17F).

Following her second surgery, the claimant treated with Dr. Rah in 1999; in March, the physician noted that the claimant could not return to her past position as an apartment manager position (Exhibit 36F). Again, despite the fact this opinion touched on the claimant's status as disabled, which is an issue reserved for the Commissioner (see generally 20 CFR 404.1527 and 416.927), the undersigned did find it consistent with this decision's assessment (see generally Finding 6 in which it was found the claimant was precluded from her past relevant work). However, little weight was given to the general opinions by

17

> the numerous workers' compensation physicians that the claimant was disabled
> under the California worker's compensations laws for the following reason: 20
> CFR 404.1504 and 416.904 both dictate that a decision by any nongovernmental
> or governmental agency about whether a claimant is disabled/blind, is based upon
> its rules and is not this Agency's decision. This Agency must make a disability
> determination based upon Social Security Law and the sequential evaluation
> process outlined herein. Therefore, any determination made by another agency
> that a claimant is disabled, is not binding on the undersigned. As such, the
> undersigned afforded very little weight to these worker's compensation opinions
> because they were not based upon an assessment of a residual functional capacity.
> Nevertheless, the opinions were considered under SSR 06-3p, as required, and
> used as additional evidence of the impact the claimant's conditions had on her
> ability to function prior to the established onset date.
>
> Fortunately, but in stark comparison to her claims that she never
> experienced symptom relief, the April 1999 records documented post-operative
> pain improvement (Exhibit 36F). Contrary to the previously discussed failure, a
> new May 1999 computerized tomography (CT) scan of the spine revealed that the
> claimant's hardware was stable despite evidence of a L5-S1 vertebral level disc
> protrusion as there was no L4-L5 disc pathology, or compromise of the spinal
> canal, lateral recess, or foramina (Exhibits 4F and 36F). At her July evaluation,
> the claimant's forward flexion remained limited but improved, and she continued
> to report low back pain improvement (Id.).

Dkt. No. 1-1 at 17-19.

However, this analysis, while lengthy, essentially points to nothing other than the fact that the ALJ believed that her symptoms were inconsistent with the objective medical evidence. As noted above, the regulations provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). Therefore, this case must be remanded yet again for the Commissioner to reevaluate Garza's subjective symptoms.

### D. Exacerbating Effects of Obesity

Garza also argues that the ALJ failed to properly assess the exacerbating effects of Garza's obesity. The Court disagrees. As the ALJ noted,

> Most recently, the representative contended that the undersigned failed to adequately consider the claimant's body habitus throughout the period of alleged disability (see generally Exhibit 26B). This is not an accurate assessment, as the prior decision clearly references SSR 02-lp, which deals directly with obesity, as well as Dr. Hutson's testimony, which considered the exacerbatory impact of this claimant's obese state in determining whether her impairments were of such severity as to meet or medically equal the relevant Listings.

Dkt. No. 1-1 at 16.

Further, the ALJ discussed this factor, finding it to be a severe impairment. Moreover, the ALJ expressly instructed medical expert Dr. Lorber to consider the effect of her obesity on Garza's other impairments. Notably, the ALJ based his RFC finding, in part, on the opinion of a state agency reviewing doctor who took Garza's obesity into account. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005) ("But the ALJ found that Sienkiewicz was obese and nothing suggests that he then disregarded that finding when evaluating whether her various medical conditions met the severity of the listed impairments."). As such, the Court finds that the ALJ properly assessed the impact of Garza's obesity.

### E. Limited Lumbar Flexion

Garza also argues that the ALJ failed to consider Garza's limited lumbar function. In fact, the ALJ did recognize and discuss this factor. Further, the jobs identified by the VE at the January 16, 2008, hearing—an addressor doing clerical work, DOT number 209.587-010, and fino assembler in the optical goods industry, DOT number 713.687-018—did not require climbing, bending, or stooping. Dkt. No. 13-2 at 44. Accordingly, any error was harmless.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED AND REMANDED** for further proceedings consistent with this Entry.

**SO ORDERED: 9/29/17**

_____
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.